```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF GEORGIA
 2                     AUGUSTA DIVISION

 3

 4   UNITED STATES OF AMERICA      :    TRANSCRIBED BY AUDIO
                                   :    RECORDING
 5                                 :
                                   :    Case Number: 109-CR-074
 6   vs.                           :
                                   :
 7   REGINALD LONNELL CRAY,        :
                                   :    Augusta, Georgia
 8           Defendant.            :    September 8, 2009
     _____ :    2:46 p.m.
 9

10

11

12       MOTION TO SUPPRESS/JACKSON-DENNO HEARING
                RICHARD MCMANAWAY'S TESTIMONY
13        BEFORE THE HONORABLE W. LEON BARFIELD
                 United States District Judge

14

15

16   APPEARANCES:

17
     For the Government:    NANCY GREENWOOD, AUSA
18                          United States Attorney's Office
                            Post Office Box 2017
19                          Augusta, Georgia 30903
                            (706) 724-0517
20
     For the Defense:       JOHN TODD GARCIA, ESQUIRE
21                          John T. Garcia, Attorney at Law
                            205-B N. Belair Rd.
22                          Evans, GA 30809
                            (706) 650-7727
23
     Transcribed By:        Rhea Rangel, Official Court Reporter
24                          Southern District of Georgia
                            1417 Troupe Street
25                          Augusta, Georgia 30904
                            (706) 823-6468
```

```
 1                        I-N-D-E-X

 2

 3

 4    WITNESS              DIRECT    CROSS    REDIRECT    RECROSS

 5    Richard McManaway      3        11        21          29

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P-R-O-C-E-E-D-I-N-G-S

2                (Excerpt begins at 2:46 p.m.)

3          MS. GREENWOOD:  Thank you, your Honor.  I would like

4    to call Special Agent Richard McManaway to the stand.

5    GOVERNMENT'S WITNESS, RICHARD MCMANAWAY, SWORN.

6          THE CLERK:  Please state your name.

7          THE WITNESS:  Richard McManaway.

8          THE CLERK:  What agency are you with?

9          THE WITNESS:  Immigration and Customs Enforcement.

10         THE COURT:  And your last name again please.

11         THE WITNESS:  McManaway.  M-c-M-a-n-a-w-a-y.

12                    DIRECT EXAMINATION

13   BY MS. GREENWOOD:

14    Q    Agent McManaway, how long have you worked with ICE?

15    A    Six years.

16    Q    And what is your position there?

17    A    I'm a special agent.

18    Q    And in that capacity, do you at times investigate

19   child pornography cases?

20    A    Yes, ma'am.

21    Q    And in the course of that work, did you have an

22   occasion to encounter this defendant, Reginald Cray?

23    A    Yes, ma'am.

24    Q    Would you please summarize for the Court, just

25   briefly, how that developed?

1      A      We received a lead from our Newark, New Jersey

2   office.  And during the course of the investigation on the lead

3   sent down from that office, a child porn investigation was

4   started at Reginald's McCray's [sic] residence in Martinez,

5   Georgia.  And that's how we ended upcoming to him.

6      Q      And it's Reginald Cray?

7      A      Yes, ma'am.  I'm sorry.

8      Q      And did you, in fact, obtain a federal search warrant

9   to search Mr. Cray's house?

10     A      Yes, ma'am.

11     Q      And do you know when that was obtained?

12     A      June 5th.

13     Q      Of?

14     A      2009.

15     Q      And then when was that executed?

16     A      I'm sorry.  That's when I did the warrant return.

17     Q      When was it issued?

18     A      On April 23rd, 2009.

19     Q      And when was it executed?

20     A      It was executed April 28th, 2009, at about 9:20 in

21   the morning.

22     Q      And were you involved in executing that search

23   warrant?

24     A      Yes, ma'am.

25     Q      And other ICE agents were involved?

1     A     Yes, ma'am.

2     Q     And what other agencies assisted in that search?

3     A     The FBI was there with us.  And the Georgia Bureau of

4  Investigations was also present.

5     Q     Anybody from the military?

6     A     There was nobody at the residence in the military.

7  There was a prosecutor that was aiding in the investigation.

8     Q     Okay.  Now, when did you -- were you involved in

9  arriving at Mr. Cray's house to execute the search warrant that

10  morning?

11     A     Yes, ma'am.

12     Q     And what did you find when you arrived?

13     A     We had an agent that arrived at about 7:00 a.m. to

14  establish that he was there and try to catch him before he left

15  the residence.  Once we all arrived, the agent that was on

16  surveillance did not see Mr. Cray.  He was gone before we got

17  on surveillance.  Once we got there, the house was secured.

18  There were no open doors, no open windows.  And we needed to

19  make entry.

20     Q     Okay.  And what did you do to effect that?

21     A     We contacted, through the military liaison, the

22  prosecutor that was helping us.  She gave us his commander, and

23  we sent the two FBI agents over to his commander's office to

24  minimize the exposure with the military.  They made contact

25  with Reginald Cray.

1     Q     Who is they?

2     A     The FBI agents.  Agent Ozden and Agent McKee.

3     Q     They made contact with Mr. Cray?

4     A     Yes.

5     Q     How did they do that?

6     A     At his place of employment there on the military

7 base.

8     Q     Where were they?

9     A     They were at the 15th Signal Core.  Where exactly, I

10 do not know.

11     Q     Okay.  Did they coordinate this meeting with anybody

12 who was in Mr. Cray's chain of command?

13     A     Yes, ma'am.  His chain of command was contacted and

14 told what was going on.  He was supposed to report to work--

15     Q     Who is he?

16     A     Mr. Cray was supposed to report to work early that

17 day.  When he did not arrive, that is when we went back to the

18 contact with his chain of command to get him to come back to

19 the residence to let us into the house so we didn't have to do

20 damage to it.

21     Q     And tell me how that came about.

22     A     Once they made contact with him through his chain of

23 command at his office, there on Fort Gordon, he was told that

24 he needed to return to his residence, that there were federal

25 agents there at his residence waiting to execute a federal

1    search warrant.

2        Q    And who was -- who told him to return to his

3    residence?

4        A    FBI Special Agent Brian Ozden and Special Agent

5    McKee.

6        Q    And that was so that he could let y'all into the

7    home?

8        A    Yes, ma'am.

9        Q    And what happened next?  Did he ride with the FBI

10   agents?

11       A    No, ma'am, he was--

12            MR. GARCIA:  Your Honor, I hate to interrupt.  Is

13   this gentlemen going to be a witness?

14            MS. GREENWOOD:  I don't anticipate that he will.

15            MR. GARCIA:  I was just asking if this was going to

16   be a witness.

17            THE COURT:  All right.

18            MR. GARCIA:  I'm sorry.

19            THE WITNESS:  I'm sorry.  What was the question?

20   BY MS. GREENWOOD:

21       Q    Did Cray return to his home in the custody of the

22   FBI?

23       A    No, ma'am.  He was -- he returned to his residence in

24   his own vehicle.  The FBI agents returned back to Cray's

25   residence in their vehicle.

1    Q    Okay.  And what happened next?

2    A    Once Cray returned to his residence, I identified

3    myself, told him that he had a federal search warrant and asked

4    him if he would open the doors for us and then once we got

5    inside I would explain everything that was going on so we would

6    not cause any more unnecessary involvement with him being in a

7    military uniform.

8    Q    With the neighbors?

9    A    Yes, ma'am.

10    Q    Go ahead.

11    A    Once inside the residence, I explained to him that we

12    had a federal search warrant issued in this area to search his

13    residence for the objects listed in the search warrant, that it

14    was a child porn investigation, and asked him if he would sit

15    down and talk to us.  I told him he did not need to stay once

16    we were inside, that he was free to leave.

17    Q    Okay.  And did he choose to stay or did he choose to

18    leave?

19    A    He was willing to sit down and talk with us.  We sat

20    down at the kitchen table and began discussing the case.

21    Q    Okay.  Now at that time, did this defendant appear to

22    be under the influence of any alcohol?

23    A    No, ma'am.  He was in uniform like he appeared to go

24    to work.  He sat down, got a notepad and seemed intelligent

25    enough that he was going to start taking notes.

1      Q     Under the influence of any medications or drugs that

2  may have impaired his ability to understand what you told him?

3      A     No, ma'am.

4      Q     Did he seem to understand when you told him that he

5  was free to leave if he wanted to?

6      A     Yes, ma'am.

7      Q     That he could do that?

8      A     Yes, ma'am.

9      Q     And then he actively chose to remain and talk to you

10  all?

11      A     Yes.

12      Q     And answered questions?

13      A     Yes.

14      Q     And, in fact, he pulled out a notepad.  Did he take

15  some notes?

16      A     He started to, but I don't think he got very far in

17  his note-taking.

18      Q     And what type of discussions did you have with him?

19      A     We had a discussion about his active duty status,

20  what he did for the military, and then about the actual child

21  porn investigation.

22      Q     And during those conversations, did he seem fully

23  aware that -- and engaged and competent to answer your

24  questions?

25      A     Yes, ma'am.

1     MS. GREENWOOD:  Your Honor, I don't know how much

2  detail the Court wants me to go into about what he actually

3  said there.  I mean, I think the question really has to do with

4  the voluntariness of the statement and noncustodial nature of

5  the interview.  But we could go as far as the Court would like.

6     THE COURT:  Well, I'll leave that up to Mr. Garcia.

7  I did have a couple of questions that I wanted to ask.

8     Special Agent McManaway, is it normal procedure under

9  these circumstances to -- I heard in your testimony that you

10  had surveillance set up out there to determine whether or not

11  the defendant was present at his residence.

12     THE WITNESS:  Yes, sir.

13     THE COURT:  And subsequently you determined he was

14  not there.

15     THE WITNESS:  Yes, sir.

16     THE COURT:  Is it standard operating procedure to

17  make attempts to get the defendant or the subject of the

18  investigation to be present at the residence during the

19  execution of search warrants?

20     THE WITNESS:  Yes, sir, it is.  With this, we knew

21  where he worked.  We knew that he was obtainable within a few

22  minutes.  So to cause minimal damage -- we either have to use a

23  ram or other entry tools that cause damage, use a locksmith or

24  have the occupants of the residence return.  Our surveillance,

25  we missed all family members, so our next option was to have

1   Mr. Cray return to the residence.  We knew where he was because

2   we had been in contact with the military.  It was a matter of

3   locating him and having him return to the residence and get us

4   in the most efficient way.

5              THE COURT:  And the purpose of that, primarily, is to

6   avoid having to--

7              THE WITNESS:  Cause damage.

8              THE COURT:  -- cause damage to get inside or call a

9   locksmith or any of the other ways of entry?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  And so you determined that there was no

12  one else at the residence at that point?

13             THE WITNESS:  Correct.

14             THE COURT:  All right.  That's all I have.

15             MS. GREENWOOD:  That's all I have, your Honor.

16             THE COURT:  Mr. Garcia.

17                          CROSS-EXAMINATION

18  BY MR. GARCIA:

19      Q    Special Agent McManaway, I have a series of

20  questions.  First of all, I was kind of stumped from the

21  beginning.  You said you had someone performing surveillance

22  out there?

23      A    Yes, sir.

24      Q    We're talking about Mr. Cray's house?

25      A    Yes, sir.

1      Q      Then at some point he was believed to be there, and

2  then it was determined that he was not?

3      A      No, sir.  I never said that he was believed -- we

4  sent somebody up to make sure they were at the residence.

5  Mr. McCray [sic] was not there.  Or, excuse me, Mr. Cray was

6  not there.  So we had to make other means to enter the

7  residence.  When we had the surveillance in position, everybody

8  occupying the residence was gone.

9      Q      And you said y'all contacted a prosecutor, military

10 prosecutor?

11     A      Yes, sir.

12     Q      And--

13     A      Well, excuse me.  She works out of the United States

14 Attorney's Office.  She handled all the cases on the military

15 and was transferred to Fort Bragg.

16     MS. GREENWOOD:  It was the Special Assistant U.S.

17 Attorney I believe.

18 BY MR. GARCIA:

19     Q      Was the person that y'all contacted in the Army?

20     A      Yes, ma'am -- or yes, sir.  Sorry.

21     Q      Don't worry about it.  I've been called worse.  All

22 right.  That person got in touch with his command, meaning the

23 people that supervised him?

24     A      Yes, sir.

25     Q      And do you know whether he was directed to return to

1   your house -- or to his house?  Excuse me.

2        A    I do not know, sir.  That military protocol, I do not

3   know.

4        Q    Do you know whether Special Agent Ozden or Special

5   Agent McKee patted Mr. Cray down?

6        A    Do not know.

7        Q    But you did testify they followed -- he was in his

8   car and they were in the other.  Do you know what he was told

9   as far as cooperating with you by his command or the agents?

10       A    I have no idea what his command told him.

11       Q    And when you went back, you say that you told him

12  that once he let you in he was free to go?

13       A    Yes, sir.

14       Q    Are you sure that's exactly what you said?

15       A    My exact words?

16       Q    Yeah.

17       A    Verbatim, I do not know, sir.  I know he was told

18  that we would be -- once we got ourself up off the street --

19  because he was in uniform.  The military asked us to keep this

20  as low profile as possible.  Once inside, I told him we had a

21  search warrant and that he was free to leave from the search

22  warrant, but we were still going to search his residence.

23       Q    Now, can you explain to me that at the end of your

24  report it describes that before you let him leave that y'all

25  contacted the United States Army.  Is that true?

1     A    No, sir.  We contacted the lady that I was referring

2    to -- I apologize; I do not remember her name -- to tell her

3    that we were done and that we would be leaving the residence

4    and that there was a weapon in the residence.  And then within

5    15, 20 minutes later, she called me back and asked that we have

6    McCray [sic] return to duty status.

7    Q    And go through that step-by-step, all right.

8    According to your testimony, when you first come to the door

9    you said, The minute you let us in you can leave, or words to

10    that effect, correct?

11    A    Yes.

12    Q    And then at the end of it, y'all patted him down; is

13    that correct?

14    A    I do not remember patting him down, sir.  I don't

15    remember.

16    Q    Do you remember having him remove the contents of his

17    pockets at that time?

18    A    Yes, sir.

19    Q    Do you remember him asking you about that time for

20    permission to use the restroom because he had an upset stomach?

21    A    Yes, sir.

22    Q    Okay.  Do you remember that y'all had a discussion

23    about what to do with him at that point?  Y'all, being the

24    agents.

25    A    I remember contacting the military, the female

1    special prosecutor.  But I don't remember discussing amongst

2    the agents of what we were going to do with him.  No, sir.

3        Q    All right.  So you talked to the -- we'll refer to

4    him as SAUSA.  You talked to the special prosecutor to find out

5    whether you could release him at that time, correct?

6        A    We contacted her to see if -- to tell her that we

7    were done with him and to leave the residence, that we were

8    leaving the residence.

9        Q    All right.  But my question is, why wouldn't you have

10   done that contact when you first went in and said, We're

11   finished with him?

12       A    I don't understand what you're asking me.

13       Q    All right.  If y'all have no claim on him whatsoever

14   from the moment that you get in the door, according to your

15   testimony, then why at the conclusion of everything would you

16   have him stopped there and have to call the special assistant

17   to determine whether to release him or not?

18       A    I just -- we -- once we were completed with it, prior

19   to leaving, I contacted her to tell her that we would not have

20   charges right then and there and that we were going to be

21   leaving.  And she said that she was going to notify his chain

22   of command.  That is when she told me to tell him to return

23   back to duty status.

24       Q    All right.  Then my question is, prior to that, if he

25   had just started to leave, what would you have done?

1      A      I wouldn't have done anything.  I would have

2      continued with the search warrant.

3      Q      Now, you testified earlier that he had the presence

4      of mind to start taking notes.  In fact, didn't you tell him,

5      no, he could not take notes?

6      A      No, sir, I did not.

7      Q      Do you recall Special Agent Ozden saying that?

8      A      No, sir, he didn't because it was my interview.

9      Q      Okay.  So you're saying nobody said he could not take

10     notes?

11     A      Correct.

12     Q      Now, when you had him in the residence, where did you

13     have him?

14     A      We were sitting at his kitchen/dining room table.

15     Q      And in the discussion, did you use any -- first of

16     all, when you said he was free to leave, did y'all use any

17     forms to signify that?

18     A      There was only one consent form done, and that was on

19     the military computer.

20     Q      That was the only form that you used?

21     A      Yes, sir.

22     Q      So you certainly didn't advise him of his

23     constitutional rights?

24     A      No, sir.

25     Q      Excuse me a second, your Honor.  During this, did you

1   ever explain to him or say to him that you're going to be

2   charged in this?  You're going to be charged?

3       A    No, sir.

4       Q    Did you ever call and tell him to "man-up" about the

5   search warrant and the underlying facts?

6       A    No, sir.  I don't remember using those words.

7       Q    All right.  Did you use any words similar to that?

8       A    Not that I recall saying, sir.

9       Q    Do you recall anybody in your presence saying those

10  words, either, "You're going to be charged" or to "man-up" to

11  Mr. Cray?

12      A    No, sir.

13      Q    Do you recall at any point saying, We're all adults.

14  We all look at porn.  Our wives get upset.  There's nothing

15  wrong with that?

16      A    Yes, sir.

17      Q    Now, did y'all, at the end of the search, pat him

18  down?

19      A    He was asked to show me the content of his pockets

20  when we were searching for any external hard drives or any

21  thumb drives or media devices.

22      Q    Do you recall Special Agent Ozden -- let me ask you

23  this way.  Did you ever become upset with Mr. Cray and leave

24  the table?

25      A    Yes, sir.

1    Q    Okay.  And at that point did Special Agent Ozden --

2    was he there at the interview with you?

3    A    Yes, sir.

4    Q    Did he stay there and talk to him?

5    A    Yes, sir.

6    Q    Were you still in the presence of Special Agent

7    Ozden?

8    A    I was still within the sight of him, yes, sir.

9    Q    Do you recall him saying, If you answer a few more

10   questions, you can go?

11   A    No, sir.

12   Q    Is it possible that he said that?

13   A    I don't know what he said exactly so I don't know.

14   Q    Well, did he say anything close to that?  If Mr. Cray

15   answered more questions then he could go?

16   A    No.

17   Q    Now, do you know how far it is between Fort Gordon

18   and his house?

19   A    No, sir, I don't.

20   Q    Would it surprise you if it was five miles?

21   A    Sir, I don't know how far he is.  Unfortunately, I

22   know very little about the Augusta area.  I could be in front

23   of both of them and couldn't tell you how to get to either one

24   of them without MapQuest.

25   Q    All right.  Now when you made -- when you were

1   discussing -- did you ever indicate to Mr. Cray that he could

2   not move around the house while you were conducting the search

3   warrant?

4          A    No, sir.

5          Q    So he could get up and go?

6          A    As long as somebody went with him, yes, sir.  Because

7   the agents were occupied with what they were doing.  He was

8   free to go anywhere he wanted to.

9          Q    All right.  Let me ask you, and let's go into some of

10  the detail that is in your report.  You indicate that Mr. Cray

11  admitted he had been viewing child porn images for the last

12  four years?

13         A    Yes, sir.

14         Q    What exactly do you recall him saying?

15         A    He said that he had been looking at child porn images

16  for over four years.

17         Q    He did not say pornography?  He specifically said

18  child porn?

19         A    Exact words, I do not remember.  If it was child porn

20  or pornography, I'm unsure of that.

21         Q    So it could have been one or the other?

22         A    Well, no, sir.  The discussions weren't about child

23  porn -- excuse me, they weren't about adult pornography.  They

24  were about child porn.

25         Q    Well, you said when you talked to him initially you

1    said, Look everybody looks at adult porn.  Don't worry about

2    it.  So at some point y'all talked about adult -- and using the

3    term "porn" loosely is adult entertainment or whatever we want

4    to call it?

5         A    Yes, sir.

6         Q    As opposed to the criminal conduct that's involved

7    with what we refer to as child porn?

8         A    Yes, sir.

9         Q    Okay.  So my question back to you is:  Did he

10   expressly say that he had been looking at child porn for the

11   last four years?

12        A    Can I refer to my incident report for a minute?

13        Q    Sure.

14        A    There was -- he was looking -- he stated that he was

15   looking at child porn for the past four years.  So it was child

16   porn, not adult or just porn.

17        Q    Did you memorialize this conversation on tape or

18   anything?

19        A    I'm sorry?

20        Q    Did you record the conversation?

21        A    No, sir.

22        Q    Did you take notes?

23        A    Yes, sir.

24        Q    And do you have those notes with you?

25        A    No, sir, just my report.

1  Q  Have you reviewed those notes other than when you

2  prepared your report?

3  A  No, sir.

4  MR. GARCIA:  If I might have a moment, your Honor.

5  THE COURT:  You may.

6  MR. GARCIA:  That's all the questions I have of this

7  witness.

8  THE COURT:  All right.

9  MS. GREENWOOD:  I have some redirect your Honor.

10  REDIRECT EXAMINATION

11  BY MS. GREENWOOD:

12  Q  Agent McManaway, when Mr. Cray arrived at his

13  residence where you and other agents were waiting to execute a

14  search warrant, he let you into the residence; is that correct?

15  A  Yes, ma'am.

16  Q  And you allowed him to let you in the residence

17  rather than to damage his property; is that right?

18  A  Yes.

19  Q  Now, once inside, you explained to him the options he

20  had available to him; is that correct?

21  A  Yes.

22  Q  And did he seem to understand what those were?

23  A  Yes, ma'am.

24  Q  Does he seem to be a man of some intelligence?

25  A  Yes, ma'am.

1    Q    And what were those options?

2    A    Once he let us in, he was free to leave.  He could

3 sit in one location and be watched by an agent as we conducted

4 the search warrant.  Or he could sit down with us and answer

5 some questions.

6    Q    You weren't going to let him just roam around the

7 house while executing a search warrant, correct?

8    A    No, ma'am.

9    Q    And why is that?

10    A    We had four or five other agents that were searching,

11 paying attention to what they were doing, not being able to

12 watch what he may do to one of them.

13    Q    And is this an individual who is in the military?

14    A    Yes.

15    Q    Would you assume that he knows how to use firearms?

16    A    Yes, ma'am.

17    Q    Did you think at that point that he might own a

18 firearm?

19    A    There was a firearm in his residence.  Yes, ma'am.

20    Q    Okay.  And so there were safety concerns about just

21 allowing him to roam around the house freely?

22    A    Yes, ma'am.

23    Q    So as I understand it, based on your testimony, his

24 options were to leave the house, sit quietly, or answer

25 questions?

1     A    Yes, ma'am.

2     Q    And he chose option number three?

3     A    Yes, ma'am.

4     Q    And did you all have discussions about what computers

5 were in the house?

6     A    Yes, ma'am.

7     Q    And what did he tell you about that?

8     A    That his wife had one upstairs, his daughter had one

9 upstairs.  There was one there by a living room/den chair that

10 was his, and I believe that there was one more found on the

11 dining room table.

12     Q    And were you able to determine how to access those

13 computers through your discussions with Mr. Cray?

14     A    Yes, ma'am.  He had told us that none of them were

15 password protected or there was no nothing installed in them

16 that would encrypt stuff, delete stuff or nothing.  There was

17 no spy software or nothing on there.

18     Q    Was that helpful in y'all's search of these

19 computers?

20     A    Yes, ma'am.

21     Q    Now, did you also ask him whether or not he had a

22 credit card with First National Bank, the credit card company

23 that had or the credit card that had come up during your

24 investigation?

25     A    Yes, ma'am.

1    Q    And did he talk to you freely about that?

2    A    Yes, ma'am.  He told us that it was upstairs in what

3  I'm referring to as a spare bedroom or the very back, corner

4  bedroom in a top set of dresser drawers or chest of drawers.

5    Q    Okay.  And did y'all locate that credit card?

6    A    Yes, ma'am, we did.

7    Q    And, again, that was a credit card that was used to

8  subscribe to a child pornography site?

9    A    Yes, ma'am.

10   Q    And you had identified that, and that was part of

11  your search warrant application; is that correct?

12   A    Yes, ma'am.

13   Q    Now, did you ask him whether or not that credit card

14  had ever been stolen or anything like that?

15   A    Yes, ma'am, I did.

16   Q    And what was his response?

17   A    That it had never been stolen or compromised.

18   Q    Okay.

19   A    That he was the only one that used it.

20   Q    Now, did you ask him if he remembered subscribing to

21  that child pornography website?

22   A    Yes ma'am, I did.

23   Q    And what did he say?

24   A    He was evasive in his answers, and he didn't remember

25  the exact name of the website.  But he remembered subscribing

1   -- he remembered the charge, didn't remember the exact amount.

2   But he remembered his credit card being charged and said that

3   there were people and stuff on that website.

4       Q    And was he able to describe to you the types of

5   images that were included on that website?

6       A    Eventually he did come around that there were

7   children or that there were people under the age of 14 in

8   sexual positions or viewed nude.

9       Q    Did he seem reluctant at first?  That's what it

10  sounds like from your testimony.

11      A    Yes, ma'am.

12      Q    Okay.  And you had testified on cross-examination

13  that at one point you had gotten up and walked away.  What was

14  the cause of that?

15      A    He was very deceptive in his answers, very reluctant

16  to answer and kept skirting around answers when we'd ask him a

17  simple question about the age of something or a question.  I

18  just did not believe that he was being honest and forthcoming

19  with the answers.

20      Q    He had the option to not talk to you at all; is that

21  correct?

22      A    Yes, ma'am.

23      Q    He was not confined in any way to the kitchen?

24      A    No, ma'am.

25      Q    Other than -- he wasn't allowed to just freely roam

1  around the house?

2      A    Correct.

3      Q    But, ultimately, he made admissions to you about

4  viewing this child pornography?

5      A    Yes, ma'am.

6      Q    Was any kind of forensic exam conducted at the

7  premises?

8      A    I know that Special Agent West was dealing with the

9  computers.  But, ma'am, what he does with them, I'm sorry, I do

10 not know.

11     Q    Okay.  Did Mr. Cray make any statements about any

12 type of special software that he uses on his computer?

13     A    He did make mention of an antivirus software that was

14 installed into one of his computers and said that, I believe,

15 it wasn't running -- it was causing it to run slow or not work

16 properly, and then he put a different one on it.

17     Q    And then Mr. Cray, in the course of this interview,

18 also consented to you searching his work computer?

19     A    Yes, ma'am.

20     Q    And that's the form you were talking about that he

21 filled out?

22     A    Yes, ma'am.

23     Q    And then you all proceeded to seize several of the

24 computers; is that correct?

25     A    Yes, ma'am.

1    Q    Did Mr. Cray say anything about his tendency to wipe

2   his computers clean on a regular basis?

3    A    I believe he did.

4        MR. GARCIA:  Your Honor, I object to the form of the

5   question.  It's leading.

6        MS. GREENWOOD:  Well, did he, that's a yes or no

7   answer.

8        THE COURT:  Wait a minute.  Don't.  Don't do that.

9   Address your comments to the Court.

10        MS. GREENWOOD:  I'm sorry.

11        THE COURT:  How do you respond, Ms. Greenwood?

12        MS. GREENWOOD:  Your Honor, I don't believe it was

13   leading.  It's a question that could be answered either yes or

14   no.

15        THE COURT:  And the question was?

16        MS. GREENWOOD:  Did Mr. Cray provide you any

17   information about whether or not he had a pattern of cleaning

18   his computer on a regular basis?

19        THE COURT:  Cleaning his computer?

20        MS. GREENWOOD:  Cleaning his computer on a regular

21   basis.

22        MR. GARCIA:  I think the first time she said wiping.

23        MS. GREENWOOD:  Wiping, cleaning.

24        THE COURT:  What's wrong with that?

25        MR. GARCIA:  Well, your Honor, it suggests that he,

1  in fact, did say that. I would almost say it's a textbook

2  leading question. Didn't he tell you -- instead of saying

3  didn't, did he tell you blah blah blah. What did he tell you--

4       MS. GREENWOOD: Your Honor.

5       THE COURT: What, if anything, did he tell you about

6  cleaning his computer?

7       MS. GREENWOOD: All right.

8       THE COURT: What, if anything, did he tell you about

9  cleaning his computer?

10      THE WITNESS: Yes, sir, he did.

11      THE COURT: What, if anything, did he tell you?

12 BY MS. GREENWOOD:

13   Q    What, if anything, did he tell you about it?

14   A    He told me that it was wiped or, excuse me, that he

15 would clean, defrag or whatever the computer term for that is

16 usually once a week.

17   Q    Do you know whether this defendant -- are you aware

18 through your investigation or through your questioning of this

19 defendant whether or not he has any experience with regard to

20 computer technology?

21   A    Yes, ma'am, he does.

22   Q    And how do you know that?

23   A    In conversations with him and through the military

24 people that I spoke with or, excuse me, the female.

25   Q    SAUSA?

1      A     He writes programs or software, manages the people

2  that writes them.  That is his background with computers in the

3  military.

4            MS. GREENWOOD:  Okay.  That's all I have, your Honor.

5            THE COURT:  All right.  Any recross?

6            MR. GARCIA:  Yes, your Honor.

7                      RECROSS-EXAMINATION

8  BY MR. GARCIA:

9      Q     To start off with, did you find any child pornography

10  images on his computer?

11      A     They were images found, but that would have to be

12  done -- what was exactly found would have to be done by the

13  forensic guy.

14      Q     Are you sure that images were found on that computer?

15      A     No, sir, I'm not.

16      Q     Okay.  Thank you.  All right.  Who told you where the

17  guns were?

18      A     Mr. Cray told us that there was a gun upstairs.

19      Q     You asked him and he told you, right?

20      A     Yes, sir.

21      Q     How tall are you roughly?

22      A     6'1".

23      Q     6'1".  How--

24      A     260.

25      Q     Do you consider yourself in fair athletic ability?

1      A    Yes, sir.

2      Q    And how, roughly, tall is Mr. Cray to you?

3      A    6'2", 6'3".

4      Q    Weight?

5      A    190.

6      Q    Is it abnormal for people to have antivirus or

7 spyware programs on their computer?

8      A    Is it abnormal?

9      Q    Yeah.

10     A    No, sir.

11     Q    It's a modern aid.  Doesn't just about everybody--

12     A    Yes, sir.

13     Q    Now, who specifically told you that he writes

14 software and manages people who write software?

15     A    The SAUSA.

16     Q    The Special Assistant United States Attorney?

17     A    That lady.

18     Q    And you are sure that she said that he writes

19 software and manages people who write software?

20     A    I don't know if those were her exact words, but he

21 works in the computer field.

22     Q    I'm sorry?

23     A    He works in the computer field in that area.

24     Q    Would you say that computers are pretty prevalent

25 throughout modern American society?

1     A     Yes, sir.

2           MR. GARCIA:  That's all I have, Judge.

3           THE COURT:  All right.  You may go down Special Agent

4     McManaway.

5           THE WITNESS:  Thank you.

6                 (Excerpt ended at 3:23 p.m.)

7

8

9

10

11

12

13

14

15

16                       CERTIFICATION

17

18           I certify that the foregoing is a true and correct

19     transcript of the stenographic record of the above-mentioned

20     matter.

21

22     /s/Rhea Rangel                        May 20, 2010

23     Rhea Rangel, Court Reporter           Date

24

25